## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**HAMPTON ROADS MARINE SERVICES, INC.,**
**d/b/a COASTAL SERVICES,**

       Plaintiff,

**v.**                                                          **Civil Action No. 2:20-cv-175**

**TALTON MARINE TERMINAL, LLC,**
**TALTON PIER 1, LLC, TALTON MARINE**
**SERVICES, LLC, JERRY O. TALTON**
**INCORPORATED, DAVID TALTON, SR.,**
**DAVID TALTON, JR., and**
**COURTNEY TALTON,**

       Defendants.

Serve:  David Talton
       13852 Loyalty Road
       Leesburg, VA 20176
       *As Reg. Agent for Talton Marine Terminal, LLC*
       *and Jerry O. Talton Incorporated*

       David Talton, Sr.
       13847 Loyalty Road
       Leesburg, VA 20176

       David N. Talton, Jr.
       1566 Montcroft Way
       Midlothian VA 23112
       *Personally and as Reg. Agent for Talton Pier 1, LLC*

       David Talton
       500 Orapax St.
       Norfolk VA 23507
       *Reg. Agent for Talton Marine Services, LLC*

       Courtney Talton
       13501 Loyalty Road
       Leesburg, VA 20176

## COMPLAINT

COMES NOW Hampton Roads Marine Service, Inc. d/b/a Coastal Services ("Coastal Services"), and for its complaint in this matter, states as follows:

### Jurisdiction and Venue

1.     This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 and 28 U.S.C. § 1331.

2.     The Court has pendent subject matter jurisdiction over claims arising under Virginia law in accordance with Rule 18(a) of the Federal Rules of Civil Procedure inasmuch as all such claims arise from a common nucleus of operative facts as the claims arising under 28 U.S.C. §§1331 and 1333 and are joined by the same party in interest.

3.     Venue is proper pursuant to 28 U.S.C. § 1391 as all defendants reside in Virginia and a substantial part of the events giving rise to the claims occurred in Virginia.

### Parties

4.     Plaintiff is a Virginia corporation with its principal office at 805 Ford Drive, Unit A, Norfolk, Virginia 23523.

5.     Defendant Talton Marine Terminal, LLC, is a Virginia limited liability company formed in 2011 with its principal office at 13847 Loyalty Rd, Leesburg, Virginia 20176. David Talton is a manager or member of this entity.

6.     Defendant Talton Pier 1, LLC is a Virginia limited liability company formed in 2019 with its principal office at 1566 Montcroft Way, Midlothian, Virginia 23112. David N. Talton, Jr. is a member of manager of this entity.

7.     Defendant Talton Marine Services, LLC is a Virginia limited liability company formed in 2019 with its principal office at 500 Orapax Street, Norfolk, Virginia 23507. David Talton is a manager or member of this entity.

8.     Defendant Jerry O. Talton Incorporated is a Virginia corporation formed in 1993 with its principal office at 450 Harbor Road, Newport News, Virginia 23607, and with David N. Talton as its President/Treasurer.

9.     Defendant David Talton, Sr. ("Talton Sr."), David Talton, Jr. (Talton Jr."), and Courtney Talton are all residents of Virginia (collectively, the "Individual Defendants").

**Military Sealift Command Prepositioning Ships**

10.     The United States government Military Sealift Command ("MSC") operates a prepositioning program, known as the PM3 program, as an essential element in the United States' military readiness strategy, providing afloat vessels with military equipment and supplies aboard and located in key ocean areas to ensure rapid availability as needed.

11.     For decades, Jerry O. Talton Incorporated, Talton Marine Terminal, LLC, Talton Marine Services, LLC, and/or Talton Pier 1, LLC (the "Talton Defendants") have provided lay berth services for MSC PM3 vessels at marine terminals in the Hampton Roads area, and in approximately 2018 one or more of the Talton Defendants began providing lay berth services to MSC vessels in Baltimore, Maryland.

12.     The Talton Defendants, individually or in combination, operate and/or control the following locations with deep water piers where MSC vessels are lay berthed, including the transverse piers used for vessel access (collectively, the "Pier Facilities"):

   a. CSX Terminal Piers 14 and 15: 450 Harbor Road, Newport News, on the James River and adjacent to the Dominion Terminal Associates' coal piers;

b.  Norfolk Southern Corporation's Lambert's Point Docks, on the Elizabeth River in Norfolk.

c.  Pier B at Newport News Marine Terminal, which is a public marine terminal in Newport News, Virginia, that is operated by Virginia International Terminals, LLC; and

d.  Pier 1 Talton Marine Terminal ("Pier 1"): located at 2000 S. Clinton Street, Baltimore, Maryland.

13.  The aforementioned Pier Facilities are the only locations in Virginia and Maryland where MSC prepositioning program vessels are lay berthed, and the Talton Defendants operate and control all such locations.

14.  Since 2003 and continuously until the events giving rise to this action, Coastal Services has provided line handling services at for the MSC vessels at some or all of the Pier Facilities as a direct vendor to one or more of the Talton Defendants, which Coastal Services believed to be Jerry O. Talton, Incorporated.

15.  Since approximately 2005, Coastal Services provided general vessel services to MSC vessels indirectly, on orders from one or more of the Talton Defendants. These vessel services include:  providing riding crews to board ships for shifting, line handling on shore, line boat service, mini-tug service, emergency hazardous material spill response, providing vessels and labor for fender movements, and boom leasing and service.

16.  In providing general vessel services to the MSC vessels berthed in Hampton Roads, Coastal Services employees routinely arrived at the MSC vessels by entering onto the Pier Facilities.

17.     In 2019, defendant Talton Sr. informed Coastal Services that it had been billing the wrong entity for years. Accordingly, on information and belief, defendant Talton Marine Terminal, LLC, and/or another defendant entity, is and was at all relevant times the operator of the Pier Facilities providing MSC vessel lay berths and are therefore referred to collectively as the Talton Defendants.

18.     Though Talton, Sr. claims and represents that either Jerry O. Talton, Incorporated or Talton Marine Terminals, LLC is the operator of the Pier Facilities, he has in fact conducted all business at each facility in his personal capacity and without benefit of any protection from any corporation or limited liability company.

19.     All actions taken by Courtney Talton have been conducted personally and not as the agent or employee of any corporation or limited liability company.

20.     All actions taken by Talton Jr. have been conducted personally and not as the agent or employee of any corporation or limited liability company.

21.     The MSC PM3 program vessels are typically operated and crewed by private entities under contract with MSC, known in military parlance as "OPCOs" (in reference to vessel "operating companies").

22.     Beginning since approximately 2014, Coastal Services has provided general vessel services to MSC vessels berthed in Hampton Roads as a direct vendor to the following OPCOs: Crowley Government Services, Keystone Shipping, United States Marine Management ("USMMI"), Ocean Ships, Inc. ("OSI"), and Patriot Contracting Services.  These services include: pumping out and disposing of oily water/slops tanks, tank cleaning, gas freeing, placing vessel fenders, crew boat service for life boat test, disposal of hazardous and non-hazardous waste, emergency pumping onboard, emergency spill response, general vessel cleaning, cofferdam

placement, scaffolding, tank top repairs, stud weld replacement,  and deploying oil containment boom around the vessel.

23.    Accordingly, since approximately 2014, Coastal Services has provided general vessel services to MSC PM3 program vessels lay berthed at Pier Facilities both as a direct vendor to OPCOs or via an order from the berth operator, one or more of the Talton Defendants and/or Individual Defendants.

24.    Coastal Services' sales to the Talton Defendants and OPCOs for general vessel services provided at the Pier Facilities increased notably beginning approximately 2016 and such sales have continued to grow each year until the events giving rise to this action.

25.    Since approximately 2016, Coastal Services has earned substantial revenue and profits from the general vessel services it provided to MSC PM3 vessels lay berthed at the Pier Facilities.

26.    Since Coastal Services began providing vessel services to MSC PM3 vessels at the Pier Facilities, the vessel OPCOs have expressed their complete satisfaction with the services provided by Coastal Services.

27.    Until the events giving rise to this action, the MSC vessel OPCOs were pleased and satisfied with the services provided by Coastal Services' at the Pier Facilities and were continuously and without interruption issuing purchase orders to Coastal Services for new services to be provided to the vessels at the Pier Facilities.

28.    Since Coastal Services began providing vessel services directly to the MSC vessel OPCOs, each OPCO has paid Coastal Services invoices in a timely manner and without complaint or dispute.

29.     Since Coastal Services began providing vessel services to MSC vessels, the Talton Defendants and the Individual Defendants have not made any contemporaneous complaints about Coastal Services employees' conduct while on a Pier Facilities.  All complaints made on and after August 1, 2019 and again on February 14, 2020, and thereafter, are false and a subterfuge designed and intended to shield the true anti-competitive nature of Defendant's actions.

30.     Billing and slow payment disputes arose in 2017 between Coastal Services and the Talton Defendants but were eventually resolved with one or more of the Talton Defendants and/or Talton, Sr. demanding Coastal Services accept reduced payment.

31.     Beginning in approximately 2018, Talton Pier 1, LLC or another of the Talton Defendants, began providing lay berth services to MSC prepositioned vessels at Pier 1 in Baltimore, Maryland.

32.     In late 2018 or early 2019, the Talton Defendants ordered boom service for the MSC vessels berthed at Pier 1 from Coastal Services, which Coastal Services provided.

33.     For most of 2018, one or more of the Talton Defendants again delayed paying Coastal Services invoices for vessel services to MSC vessels invoiced through one or more of the Talton Defendants.  In March 2019, one or more of the Talton Defendants and/or Individual Defendants paid Coastal Services a reduced amount for all outstanding invoices, demanding in writing Coastal Services accept it as full payment, and noting that the Talton Defendants and/or Talton Sr. could perform the same services as Coastal Services.

34.     On information and belief, one or more of the Talton Defendants and/or Individual Defendants have provided, or have ordered from another vendor, all necessary boom service for the MSC vessels lay berthed at Pier 1 since approximately March 12, 2020.

35.     On information and belief, one or more of the Talton Defendants and/or Individual Defendants have competed for and provided general vessel services to the MCS OPCOs since the vessels have been lay berthed at the Pier Facilities.

### The Blacklisting of Coastal Services from the Pier Facilities

36.     On or about February 18, 2020, while Coastal Services was providing vessel services to OPCO Crowley Government Services for the USNS PLESS at the Pier Facility at Lambert's Point Docks, Coastal Services noticed no environmental boom was deployed in the waters surrounding the vessel, and the vessel Port Engineer instructed Coastal Services to contact the Pier Facility point of contact, Courtney Talton, about terminal requirements, which Coastal Services did. Coastal Services never received a response to its inquiry.

37.     Rather, on or about February 19, 2020, Talton Sr. sent a letter via email to Coastal Services on "Talton Marine Terminal" ("TMT") letterhead informing Coastal Services that it was prohibiting Coastal Services from physically entering any Pier Facilities, by land or by water (the "TMT Letter"), except to complete contracts that "predate" February 14, 2020.  *See* **TMT Letter, Exhibit A hereto.**[1]

38.     On or about February 19, 2020, Talton Sr. and the Talton Defendants informed the OCPOs that Coastal Services was restricted from access to the Pier Facilities and also sent the TMT Letter to the OPCOs.

39.     The TMT Letter falsely cites as cause for banning Coastal Services "a long history of noncompliance, unnecessary drama, inappropriate worker conduct, rude behavior, slander" among other reasons, including a suggestion that Coastal Services puts TMT's "layberth contracts with the facilities in jeopardy."  *See* **Exhibit A** at 1.

---

[1] Though the letter indicates it was also sent also as a "Certified Letter," Coastal Services did not receive a hard copy of the letter.

40.    The Talton Defendants and the Individual Defendants, by prohibiting Coastal Services from entering its facilities, have prevented Coastal Services from providing any vessel services to the OPCOs.

41.    As of the February 19, 2020 TMT Letter, Coastal Services was prohibited from bidding on any new purchase orders from MSC vessel OPCOs, despite a longstanding history of repeat purchase orders from them.

42.    Further, on or about March 12, 2020, Courtney Talton sent a letter to the Virginia Port Authority Police Department ("Port Police") on "Talton Marine Terminals" letterhead (the "Port Police Letter") instructing the Port Police to restrict Coastal Services in its access to the Pier Facilities under the purview of the Virginia Port Authority. *See* **Port Police Letter, attached hereto as Exhibit B.**

43.    As of March 12, 2020, Coastal Services has been restricted in its access to the Pier Facilities via Port Police and security agents for one or more of the Talton Defendants ("TMT Security"), who were instructed to take such action by the Talton Defendants and Courtney Talton. As a result, Coastal Services was forced to institute a work stoppage on or about March 16, 2020, for the USNS SHUGHART berthed at the NNMT and could not perform its purchase order issued by OSI.

44.    The same restriction resulted in a work stoppage for the USNS GORDON and USNS GILLILAND berthed at Pier 1 on or about March 12, 2020, and Coastal Services could not perform as per its purchase order issued by OSI.  As a result of the Talton Defendants' and Courtney Talton's actions, OSI cancelled the current purchase order and issued it to another vendor.

## **Count One: Piercing the Corporate Veil**

45.     The allegations in Paragraphs 1 through 44, above, are incorporated herein by reference.

46.     The Talton Defendants are alter-ego entities of the Individual Defendants, engaging in business without regard for corporate formalities. Among Defendants' actions in disregard for the corporate form, the Individual Defendants signed corporate correspondence in an individual capacity, without any acknowledgement of or reference to their status as officers or agents.  Furthermore, Talton Defendants failed to use corporate identifiers and failed to operate in an official capacity under a single name, regularly interchanging between "Talton Marine Terminal" and "Talton Marine Terminals," while additionally operating under other entity names.

47.     The Individual Defendants undercapitalized at least one business entity, with which Coastal Services contracted and to which Coastal Services rendered services.  The Talton Defendants continued to receive bills and issue payments or partial payments in satisfaction of debts owed by the inactive entity, using the shell company as a shield in deferring payment and a sword in negotiations to force reduced payments.

48.     Operating in a limited capacity under the undercapitalized business entity allowed the Individual Defendants to evade or attempt to evade corporate business obligations in paying their debts to Coastal Services.

49.     Because the Talton Defendants have been operated as a sham, the Individual Defendants, and each of them, are personally liable for the actions purportedly performed in the name of the Talton Defendants.

**Count Two: Violation of Sherman Act § 1, 15 U.S.C. § 1: Conspiracy to Restrain
Trade Against the Individual Defendants, or Alternatively, the Talton Defendants**

50.     The allegations in Paragraphs 1 through 49, above, are incorporated herein by reference.

51.     The Talton Defendants are sham entities created and used for the purpose of shielding the Individual Defendants from liability for their combination and conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

52.     The Individual Defendants conspired among themselves, or, in the alternative, the Talton Defendants conspired among themselves, and agreed to and did participate in anticompetitive conduct that unreasonably restrained trade and commerce.

53.     The Individual Defendants, or in the alternative, the Talton Defendants, conspired among themselves to take actions and implement policies that restricted Coastal Services from using the Pier Facilities, foreclosing its ability to compete for vessel services required by MSC at the Pier Facilities.

54.     This conspiracy has enhanced and further solidified the Defendants' monopoly power in the relevant market, which has restricted competitive bids and increased the prices charged to OPCOs, and ultimately the United States government and taxpayers, for MSC vessel services.

55.     The Defendants' anticompetitive conduct is *per se* a violation of Section 1 of the Sherman Act.

56.     Alternatively, under the antitrust Rule of Reason, there is no legitimate business justification for the Defendants' actions and the conduct adopted and implemented in their combination and conspiracy.  The anticompetitive effects of the Defendants' conduct far

11

outweighs any procompetitive benefits or justification.  Any business justification or procompetitive benefits could have been achieved by less restrictive means.

57.     As a direct and proximate result of the Defendants' combination and conspiracy, The Defendants have unreasonably restrained trade and commerce.  They have excluded actual and potential competition from the relevant market, and they profited from their anticompetitive conduct by establishing and maintaining artificially high prices for vessel services charged to OPCOs and provided to MSC vessels.

58.     As a direct and proximate result of the Defendants' combination and conspiracy, the Defendants injured Coastal Services and OPCOs.  As a result of the Defendants' combination and conspiracy, OPCOs, and ultimately the United States government and taxpayers, paid and will continue to pay artificially inflated rates for vessel services.  Antitrust laws were designed and enacted to prevent the very injuries caused by the Defendants' conduct.

59.     In addition to compensatory damages, Coastal Services is entitled to treble damages, costs, attorneys' fees, and other relief pursuant to 15 U.S.C. § 15.

### Count Three: Violation of Sherman Act § 2, 15 U.S.C. § 2: Conspiracy to Monopolize Against the Individual Defendants, or Alternatively, the Talton Defendants

60.     The allegations in Paragraphs 1 through 59, above, are incorporated herein by reference.

61.     The Talton Defendants are sham entities created and used for the purpose of shielding the Individual Defendants from liability for acting with a specific intent to combine or conspire to monopolize and to destroy competition in the relevant market.  The Individual Defendants, or in the alternative, the Talton Defendants, devised and implemented a plan in furtherance of the conspiracy to systematically eliminate competition in the relevant market, in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

62.     The Individual Defendants, or alternatively the Talton Defendants, conspired together to willfully engage in a course of exclusionary conduct in furtherance of the conspiracy to obtain a monopoly in the relevant market, including:

(a) denying Coastal Services access to the Pier Facilities to conduct business on longstanding, ongoing contracts and business expectancies with various OPCOs;

(b) discriminating against Coastal Services by prohibiting OPCOs from continuing to receive its services and preventing OPCOs from doing business with their preferred vendor at the Pier Facilities, Coastal Services;

(c) forcing limitations on OPCOs' choices for receiving and/or accepting competitive bids;

(d) replicating Coastal Services' vessel services for the purpose and effect of eliminating Coastal Services as a competitor, prohibiting additional competition for those services, and restricting OPCOs' freedom of choice in the bid process;

(e) requiring that OPCOs do business with the Individual Defendants, or alternatively the Talton Defendants, for services previously awarded to Coastal Services; and

(f) setting rates at a level unchecked by the competitive bid process, leaving OPCOs no choice but to pay the Individual Defendants and/or the Talton Defendants, for services they could and would otherwise secure from Coastal Services, or another competitor, at a lower rate.

63.     Defendants do not have a legitimate business purpose for the anticompetitive conduct in furtherance of the conspiracy.  Any claimed procompetitive benefit is pretextual, and

the Defendants' conduct does not result in greater competition in the relevant market.  The only "benefit" that flows from the Individual Defendants', or alternatively the Talton Defendants', conduct is a reduction in competition, advantaging only the respective group of the Defendants, not customers or competition in the relevant market.

64.     The Defendants' anticompetitive acts in furtherance of the conspiracy to monopolize have injured competition in the relevant market, diminished Coastal Services' ability to bid on any new purchase orders from MSC vessel OPCOs, prevented Coastal Services from providing any vessel services to the OPCOs, and forced Coastal Services to turn away new requests from OPCOs when contacted for bid submission, costing it immediate revenue and future earnings.

65.     The Defendants' course of conduct has and will continue to exclude competition in the relevant market and otherwise deprive OPCOs the ability to make an unfettered choice of vendors, on the merits of their work.

66.     In addition to compensatory damages, Coastal Services is entitled to treble damages, costs, attorneys' fees, and other relief pursuant to 15 U.S.C. § 15.

### Count Four: Violation of Sherman Act § 2, 15 U.S.C. § 2: Monopolization Against All Defendants

67.     The allegations in Paragraphs 1 through 66, above, are incorporated herein by reference.

68.     The Defendants' conduct constitutes the intentional maintenance of monopoly power in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

69.     For purposes of maintaining monopoly power, Defendants committed anticompetitive acts, including:

(a) denying Coastal Services access to the Pier Facilities to conduct business on

longstanding, ongoing contracts with various OPCOs;

(b) discriminating against Coastal Services by prohibiting OPCOs from continuing to receive its services and preventing OPCOs from doing business with their preferred vendor at the Pier Facilities, Coastal Services;

(c) forcing limitations on OPCOs' choices for receiving and/or accepting competitive bids;

(d) replicating Coastal Services' vessel services for the purpose and effect of eliminating Coastal Services as a competitor, prohibiting additional competition for those services, and restricting OPCOs freedom of choice in the bid process;

(e) requiring that OPCOs do business with the Individual Defendants, or alternatively the Talton Defendants, for services previously awarded to Coastal Services; and

(f) setting rates at a level unchecked by the competitive bid process, leaving OPCOs no choice but to pay the Individual Defendants and/or the Talton Defendants for services they could and would otherwise secure from Coastal Services, or another competitor, at a lower rate.

70.    The Defendants have excluded Coastal Services from the relevant market and have deprived consumers of the benefit of competition among vendors.

71.    The Defendants do not have a legitimate business purpose for any of their anticompetitive conduct.  Any claimed procompetitive benefit is pretextual, and the Defendants' conduct does not result in greater competition in the relevant market.  The only "benefit" that flows from the Defendants' conduct is a reduction in competition, advantaging only the Defendants, not customers or competition in the relevant market.

72.     The Defendants' monopolization has injured competition in the relevant market, diminished Coastal Services' ability to bid on any new purchase orders from MSC vessel OPCOs, prevented Coastal Services from providing any vessel services to the OPCOs, and forced Coastal Services to turn away new requests from OPCOs when contacted for bid submission, costing it immediate revenue and future earnings.

73.     The Defendants' course of conduct has and will continue to exclude competition in the relevant market and otherwise deprive OPCOs the ability to make an unfettered choice of vendors, on the merits of their work.

74.     In addition to compensatory damages, Coastal Services is entitled to treble damages, costs, attorneys' fees, and other relief pursuant to 15 U.S.C. § 15.

## Count Five: Sherman Act § 2, 15 U.S.C. § 2: Attempted Monopolization Against All Defendants

75.     The allegations in Paragraphs 1 through 74, above, are incorporated herein by reference.

76.     The Defendants' acted with specific intent to monopolize and to destroy competition in the relevant market.  Defendants devised and implemented a plan to systematically eliminate competition in the relevant market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

77.     Defendants willfully engaged in a course of exclusionary conduct to obtain a monopoly in the relevant market, including

(a) denying Coastal Services access to the Pier Facilities to conduct business on longstanding, ongoing contracts and business expectancies with various OPCOs;

(b) discriminating against Coastal Services by prohibiting OPCOs from continuing to receive its services and preventing OPCOs from doing business with their

preferred vendor at the Pier Facilities, Coastal Services;

(c) forcing limitations on OPCOs' choices for receiving and/or accepting competitive bids;

(d) replicating Coastal Services' vessel services for the purpose and effect of eliminating Coastal Services as a competitor, prohibiting additional competition for those services, and restricting OPCOs' freedom of choice in the bid process;

(e) requiring that OPCOs do business with the Individual Defendants, or alternatively the Talton Defendants, for services previously awarded to Coastal Services; and

(f) setting rates at a level unchecked by the competitive bid process, leaving OPCOs no choice but to pay the Individual Defendants and/or the Talton Defendants for services they could and would otherwise secure from Coastal Services, or another competitor, at a lower rate.

78.    Defendants do not have a legitimate business purpose for any of its anticompetitive conduct.  Any claimed purpose is pretextual in light of the obvious competitive circumstance and associated marketplace conduct.  The Defendants' conduct does not result in greater competition in the relevant market.

79.    During the time the Defendants engaged in this exclusionary conduct, they had a high probability of succeeding in gaining a monopoly in and controlling the relevant market and excluding their competitors.

80.    The Defendants' attempts to destroy competition in the relevant market have injured competition in the relevant market, diminished Coastal Services' ability to bid on any new purchase orders from MSC vessel OPCOs, prevented Coastal Services from providing any

17

vessel services to the OPCOs, and forced Coastal Services to turn away new requests from OPCOs when contacted for bid submission, costing it immediate revenue and future earnings.

81.    The Defendants' course of conduct has and will exclude competition in the relevant market and otherwise deprive OPCOs the ability to make an unfettered choice of vendors, on the merits of their work.

82.    In addition to compensatory damages, Coastal Services is entitled to treble damages, costs, attorneys' fees, and other relief pursuant to 15 U.S.C. § 15.

### Count Six: Sherman Act § 2, 15 U.S.C. § 2: Monopolization and Essential Facilities Doctrine Against All Defendants

83.    The allegations in Paragraphs 1 through 82, above, are incorporated herein by reference.

84.    The Defendants have willfully acquired and possess monopoly power in the provision of lay berth services to MSC vessels in its PM3 prepositioning program at all locations in the mid-Atlantic region where MSC deems it strategically necessary to berth its PM3 vessels.

85.    The Defendants also provide general vessel services, in addition to lay berth services, to the MSC PM3 vessels berthed at the Pier Facilities.

86.    These Pier Facilities over which the Defendants have possession and control are essential facilities in the industry of general vessel services to MSC PM3 prepositioning program vessels.

87.    Coastal Services nor any other competitor can practically or reasonably duplicate the Pier Facilities.

88.    The Defendants have used their monopoly power in the MSC PM3 lay berth services marketplace to unreasonably exclude competition in the general vessel services market, by denying plaintiff Coastal Services all physical access to the Pier Facilities, even though the

MSC vessel OPCOs are involved in beneficial business relationships with Coastal Services in mutually-agreed relations.

89.     The Defendants' exclusion is unreasonable in that the purported cause for the exclusion of Coastal Services is pretextual and not based in fact.

90.     The Defendants have used their monopoly power over essential facilities to prevent their clients, MSC OPCOs, from doing business with their preferred vendor at the Pier Facilities, Coastal Services.  As such, the OPCOs must do business with the Talton Defendants and/or Individual Defendants or from other vendors, business that they would otherwise have been awarded to Coastal Services.

91.     The Defendants have intentionally used their control over essential facilities to control access to the MSC PM3 vessel services marketplace and eliminate or stifle competition.

92.     As evidenced by the long period of time in which the Defendants allowed Coastal Services on the Pier Facilities to provide services to them and/or to the OPCOs directly, it is feasible for the Defendants to provide Coastal Services physical access to the Pier Facilities to perform vessel services for the MSC vessels berthed at the Pier Facilities.

93.     By reason of the Defendants' actions, Coastal Services is unable to compete in the MSC PM3 vessel services marketplace, and as such it has suffered financial loss and damage to current and future business prospects in amounts that continue to increase on a monthly basis.

**Count Seven: Tortious Interference with Maritime Contracts Against All Defendants**

94.     The allegations in Paragraphs 1 through 93, above, are incorporated herein by reference.

95.     Coastal Services had contractual relationships or business expectancies with MSC vessel OPCOs at the time the Individual Defendants, the Talton Defendants, and/or Talton Sr. sent

their February 19, 2020 letter to the MSC vessel OPCOs barring Coastal Services from the Pier Facilities.

96.    The recurrent purchase orders were continuous, without interruption, and constitute a reasonably certain expectation for Coastal Services' business.

97.    As of February 19, 2020, Coastal Services was prohibited from bidding on any new purchase orders for those MSC vessel OPCOs, despite a longstanding history of repeat purchase orders from them.

98.    As of March 12, 2020, Coastal Services was restricted in its access to the Pier Facilities via Port Police and security agents for one or more of the Talton Defendants ("TMT Security"), who were instructed to take such action by the Individual Defendants, the Talton Defendants, and/or Courtney Talton.  As a result, Coastal Services was forced to institute a work stoppage on or about March 16, 2020, for the USNS SHUGHART berthed at the NNMT and could not perform its purchase order issued by OSI.

99.    The same restriction resulted in a work stoppage for the USNS GORDON and USNS GILLILAND berthed at Pier 1 on or about March 12, 2020, and Coastal Services could not perform as per its purchase order issued by OSI.  As a result of the Defendants' actions, OSI cancelled the current purchase order and issued it to another vendor.  During this time the Defendants also prevented Coastal Services from accessing its own equipment for use elsewhere, while making various unfounded claims and accusations before ultimately releasing the detained equipment.

100.    The Defendants knew Coastal Services provided numerous maritime vessel services to OPCOs at the Pier Facilities and that access to the Pier Facilities was necessary to complete current purchase orders and bid for new ones.  Their actions were an intentional effort to

induce or cause a breach or termination of Coastal Services' relationships and/or business expectancies; the Defendants intended to "do in" Coastal Services' business viability.   The Defendants acted with a willful and wanton disregard for Coastal Services' contracting rights.

101.    Absent the Defendants' intentional misconduct, Coastal Services would have continued their relationships and realized the economic benefit of their business expectancies; OPCOs would have engaged Coastal Services had it been able to continue its access to the Pier Facilities.

102.    As a result of the Defendants' actions, Coastal Services has suffered financial loss and damage to future business prospects in amounts that continue to increase on a monthly basis. In addition to the monetary damages, because the Defendants' conduct was intentionally undertaken with malice to harm Coastal Services and benefit themselves, Coastal Services is further entitled to punitive damages.

### Count Eight: Business Conspiracy in Violation of Va. Code § 18.2-499
### Against the Individual Defendants, or Alternatively, the Talton Defendants

103.    The allegations in Paragraphs 1 through 102, above, are incorporated herein by reference.

104.    The Talton Defendants are sham entities created and used for the purpose of shielding the Individual Defendants from liability for their unlawful acts.

105.    On or about February 19, 2020, Talton Sr., Talton Jr., and Courtney Talton each acted outside of their scope of employment and conspired, by express agreement and tacit understanding, with each other, or alternatively, with the Talton Defendants. By agreeing to exclude Coastal Services from the Pier Facilities, and Talton Sr. signing and sending a letter to OPCOs regarding same, the Individual Defendants, with each other, or with the Talton Defendants, engaged in concerted action to intentionally, purposefully, and without lawful justification

willfully and maliciously interfere with and damage Coastal Services' reputation, current business, and future business expectations.

106.    On March 12, 2020, Courtney Talton acted outside of her scope of employment and conspired, by express agreement and tacit understanding, with the Talton Sr. and Talton Jr., or alternatively, with the Talton Defendants.  By agreeing to send and actually sending a joint letter to the Port Police, they engaged in concerted action with each other, or with the Talton Defendants, to prohibit Coastal Services from entering the Pier Facilities, and intentionally, purposefully, and without lawful justification willfully and maliciously interfere with and damage Coastal Services' reputation, current business, and future business expectations.

107.    The Talton Defendants and Individual Defendants knew that Coastal Services had ongoing contracts to service vessels with Crowley Government Services, USMMI, and OSI; they had actual or constructive knowledge that Coastal Services regularly bid on and acquired sequential contracts with the aforesaid OPCOs.

108.    Because of their conspiratorial action, Coastal Services was prohibited from entering the Pier Facilities, and it could not perform contracted services or engage in bidding for additional purchase orders from OPCOs.

109.    Each of the Individual Defendants has benefitted, either directly or indirectly, as a result of the conspiracy.  They stood to benefit in their personal capacities from the conspiracy to ban Coastal Services from the Pier Facilities, maliciously and intentionally interfere with and damage Coastal Services' reputation, current business, and business expectancies, and profit from redirecting the required services to themselves.

110.    As a result of the conspiracy, Coastal Services has suffered financial loss and damage to future business prospects in amounts that continue to increase on a monthly basis.

111.    In addition to compensatory damages, Coastal Services is entitled to treble damages, lost profits, punitive damages, attorneys' fees, and other relief pursuant to Va. Code. § 18.2-500.

### Count Nine: Civil Conspiracy Against Individual Defendants, or Alternatively, the Talton Defendants

112.    The allegations in Paragraphs 1 through 111, above, are incorporated herein by reference.

113.    The Individual Defendants have conspired, by express agreement and tacit understanding, with each other, or alternatively with the Talton Defendants, to intentionally, purposefully, and without lawful justification willfully and maliciously interfered with Coastal Services' business expectations.  The Individual Defendants and/or the Talton Defendants acted without lawful justification.

114.    The conspiracy has harmed Coastal Services by causing it to lose business with OPCOs, namely Crowley Government Services, USMMI, and OSI, due to its inability to access the Pier Facilities.

115.    Each of the Individual Defendants has benefitted, either directly or indirectly, as a result of the conspiracy.  They stood to benefit in their personal capacities from the conspiracy to ban Coastal Services from the Pier Facilities, maliciously and intentionally interfere with and damage Coastal Services' reputation, current business, and business expectancies, and profit from redirecting the required services to themselves.

116.    As a result of the conspiracy, Coastal Services has suffered financial loss and damage to future business prospects in amounts that continue to increase on a monthly basis

117.    In addition to compensatory damages, Coastal Services is entitled to punitive damages because the collective Defendants acted with malice.

**Count Ten: Defamation Against David Talton Sr.**

118.    The allegations in Paragraphs 1 through 117, above, are incorporated herein by reference.

119.    On February 19, 2020, Talton Sr. personally signed and sent a letter, on "Talton Marine Terminal" Letterhead, to the OPCOs that made false statements about Coastal Services. Talton Sr. acted with malice; he made the statements, knowing they were false, or with reckless disregard for their truth.

120.    Talton Sr. published the letter to all OPCOs, including several of those with which Coastal Services had past and current purchase orders.

121.    Talton Sr. intended his false statements of fact to damage Coastal Services' business and reputation, and he made the statements with the intent and effect of lowering Coastal Services in the estimation of the community, making it appear unprofessional and ridiculous, and deterring OPCOs from associating or dealing with it.

122.    By reason of Talton Sr.'s aforesaid actions, Coastal Services been injured in its good name and standing in the community, causing Coastal Services to suffer in its business, reputation, and business repute.

123.    Coastal Services has been forced to suffer trouble, inconvenience, loss of time and economic hardship in attempting to seek redress and overcome damages caused by Talton Sr., resulting in impairment to reputation, as well as financial loss and damage to future business prospects in amounts that continue to increase on a monthly basis.

124.    In addition to compensatory damages, Coastal Services is entitled to punitive damages because Talton Sr. acted with malice.

**Count Eleven:  Defamation *Per Se* Against David Talton, Sr.**

125.    The allegations in Paragraphs 1 through 124, above, are incorporated herein by reference.

126.    On February 19, 2020, Talton Sr. personally signed and sent a letter, on "Talton Marine Terminal" Letterhead, to the OPCOs that made false statements about Coastal Services.

127.    Talton Sr. published the letter to all OPCOs, including several of those with which Coastal Services had past and current purchase orders.

128.    Talton Sr. intended his false statements of fact to damage Coastal Services' business and reputation, and he made the statements with the intent and effect of lowering Coastal Services in the estimation of the community, making it appear unprofessional and ridiculous, and deterring OPCOs from associating or dealing with it.

129.    The words and statements in this letter impute to Coastal Services unfitness to perform the duties of its business or trade and a want of integrity in the discharge of its business or trade, and they prejudice Coastal Services in its business trade.

130.    Alternatively, the words and statements in this letter, when considered in context, by innuendo and/or insinuation, imply Coastal Services' unfitness to perform the duties of its business or trade and a want of integrity in the discharge of its business or trade, and they prejudice Coastal Services in its business trade.

131.    By reason of Talton Sr.'s aforesaid actions, Coastal Services has been injured in its in its business, trade, reputation, and business repute.

132.    Coastal Services has been forced to suffer trouble, inconvenience, loss of time and economic hardship in attempting to seek redress and overcome damages caused by Talton Sr.,

resulting in financial loss and damage to future business prospects in amounts that continue to increase on a monthly basis.

133.    Coastal Services is entitled to recover both general damages for injury to its business reputation and general loss on falling off of its business which are presumed to be the natural, proximate, and necessary result of the publication of said letter, and special damages which may be proven at trial.

<strong><u>Count Twelve: Defamation Against Courtney Talton</u></strong>

134.    The allegations in Paragraphs 1 through 133, above, are incorporated herein by reference.

135.    On or about March 12, 2020, Courtney Talton personally signed and sent a letter, on "Talton Marine Terminals" letterhead, to Port Police/TMT Security that made various false statements about Coastal Services.  ***See* Exhibit B.**

136.    Ms. Talton published the letter with reckless disregard for the truth, and Ms. Talton knew or should have known that the letter falsely portrayed Coastal Services' business reputation. Ms. Talton published the letter with the intent and effect of lowering Coastal Services in the estimation of the community, making it appear unprofessional and ridiculous, and deterring OPCOs from associating or dealing with them.

137.    By reason of Ms. Talton's aforesaid actions, Coastal Services has been injured in its good name and standing in the community, causing it to suffer in its business, reputation, and business repute.

138.    Coastal Services has been forced to suffer trouble, inconvenience, loss of time and economic hardship in attempting to seek redress and overcome damages caused by Ms. Talton,

resulting in impairment to its reputation, as well as financial loss and damage to future business prospects in amounts that continue to increase on a monthly basis.

139.    In addition to compensatory damages, Coastal Services is entitled to punitive damages because Ms. Talton acted with malice.

<u>**Count Thirteen:  Defamation *Per Se* Against Courtney Talton**</u>

140.    The allegations in Paragraphs 1 through 139, above, are incorporated herein by reference.

141.    On or about March 12, 2020, Courtney Talton personally signed and sent a letter, on "Talton Marine Terminals" letterhead, to Port Police/TMT Security that made various false statements about Coastal Services.  ***See* Exhibit B.**

142.    Ms. Talton published the letter with reckless disregard for the truth, and Ms. Talton knew or should have known that the letter falsely portrayed Coastal Services' business reputation. Ms. Talton published the letter with the intent and effect of lowering Coastal Services in the estimation of the community, making it appear unprofessional and ridiculous, and deterring OPCOs from associating or dealing with them.

143.    The words and statements in this letter impute to Coastal Services unfitness to perform the duties of its business or trade and a want of integrity in the discharge of its business or trade, and they prejudice Coastal Services in its business trade.

144.    Alternatively, the words and statements in this letter, when considered in context, by innuendo and/or insinuation, imply Coastal Services' unfitness to perform the duties of its business or trade and a want of integrity in the discharge of its business or trade, and they prejudice Coastal Services in its business trade.

145.    By reason of Ms. Talton's aforesaid actions, Coastal Services has been injured in its in its business, trade, reputation, and business repute.

146.    Coastal Services has been forced to suffer trouble, inconvenience, loss of time and economic hardship in attempting to seek redress and overcome damages caused by Ms. Talton, resulting in financial loss and damage to future business prospects in amounts that continue to increase on a monthly basis.

147.    Coastal Services is entitled to recover both general damages for injury to its business reputation and general loss on falling off of its business which are presumed to be the natural, proximate, and necessary result of the publication of said letter, and special damages which may be proven at trial.

**WHEREFORE**, Plaintiff prays this Honorable Court will:

1.    Enter Judgment in its favor against the Defendants, and each of them, jointly and severally, and award damages to plaintiff  in amounts to be proved at trial as to each Count, said amounts to be trebled, or such other and further amounts as proof may warrant;

2.    Award punitive damages against Defendants, and each of them, jointly and severally, in the amount of $350,000;

3.    Issue an order permanently enjoining Defendants, and each of them, from restraining or interfering with Plaintiff's access to Defendants' marine terminals or otherwise interfering with Plaintiff's efforts to perform services to the Military Sealift Command Vessels berthed at said terminals.

4.    Award Plaintiff such other and further relief as the Court considers necessary or appropriate to restore competitive conditions to the markets affected by the Defendants' unlawful conduct in violation of Sections 1 and 2 of the Sherman Act.

5.    That Plaintiff recovers the costs of this action, including its attorney fees, and prejudgment interest, and such other and further relief as may be just and proper.

**HAMPTON ROADS MARINE SERVICES, INC.,**
**d/b/a COASTAL SERVICES,**

By:  /s/ David N. Ventker
        Of Counsel

David N. Ventker (VSB No. 29983)
Marissa M. Henderson (VSB No. 44156)
Ventker Henderson, PLLC
256 West Freemason Street
Norfolk, Virginia 23510
Telephone:  757.625.1192
Facsimile:  757.625.1475
dventker@ventkerlaw.com
mhenderson@ventkerlaw.com